185 N.J. Super. 553 (1982)
449 A.2d 1350
BONNER PROPERTIES, INC., A DELAWARE CORPORATION AND QUAIL BROOK, INC., A NEW JERSEY CORPORATION, PLAINTIFFS,
v.
PLANNING BOARD OF THE TOWNSHIP OF FRANKLIN, SOMERSET COUNTY, NEW JERSEY, THE MAYOR AND COUNCIL OF THE TOWNSHIP OF FRANKLIN, AND THE TOWNSHIP OF FRANKLIN, A MUNICIPAL CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Law Division Somerset County.
Decided June 11, 1982.
*558 Frederic K. Becker for plaintiffs (Wilentz, Goldman & Spitzer, attorneys; Lawrence J. Freundlich on the brief).
Dennis Alan Auciello for the Planning Board of the Township of Franklin.
Stanley Cutler for the Mayor and Council of the Township of Franklin, and the Township of Franklin.
*559 MEREDITH, J.S.C.
This complaint in lieu of prerogative writs centers on the question of whether a municipality, after approving a developer's plans for a condominium project, may deny him permission to amend those plans so that ownership of the common elements in the project would be severed from ownership of its individual units and so that unit ownership would include ownership of the plot of land upon which the unit improvements are to be constructed.

I
On June 23, 1976 the Planning Board of Franklin Township granted tentative approval to 1020 Associates to construct a planned unit development on some 700 acres of its property located within the township. The resolution of approval provided for construction in seven phases extending over a period of 15 years. It contemplated that approximately 375 acres in the development would be devoted to commercial, industrial and recreational uses, including public parkland and common open space. The remainder of the tract would be used for residential purposes and would ultimately include 244 single-family units, 1228 townhouse units, and 985 apartment units. The resolution further provides that "all multi-family dwelling units shall be constructed substantially in accordance" with certain floor plans submitted to the planning board; however, par. 25 states that
... the right is reserved to the applicant to apply to the Planning Board from time to time to consider the change of said plans as market demands may dictate and in order to put to use new concepts and ideas. No changes in any such plans shall be made without the formal approval of the Planning Board of the Township of Franklin and it is the expressed intent of the Planning Board to maintain the overall integrity of the plan as now presented.
On August 26, 1976, 1020 Associates conveyed to Bonner Properties, Inc. all rights under the aforementioned resolution as well as title to the 700-acre tract in question. Bonner then proceeded to expend "substantial monies" to provide utility, sewer, water and road facilities to the entire development.
*560 In March 1979, within the time limit set out by the resolution, Bonner applied for final approval of Phase I, Section A, B, and C, of the development (hereinafter "Phase I"), a lateral project of 334 condominium units and common elements to be constructed on some 47 acres of the development tract. At about the same time, on March 6, 1979, Bonner transferred title to Phase I to Quail Brook, Inc., a wholly-owned subsidiary of Bonner. Although the deed of conveyance was recorded on March 13, 1979, the planning board was allegedly without knowledge of the transfer when it granted Bonner final approval for Phase I, on April 11, 1979. Later, on March 6, 1981 Quail Brook entered into agreement with Kaufman and Broad of New Jersey, Inc., which provided for the sale of the subject property to Kaufman for $3,006,000, but this agreement is not directly relevant here.
On May 21, 1981 Quail Brook applied to the planning board for an amendment to its April 11, 1979 resolution of final approval. Under the proposed amendment the 334 residential units would be sold, not as condominiums but in "fee simple form." This term is admittedly inaccurate in that condominium properties are also typically held in fee simple. What the proposed amendment sought was rather an extension of the unit property held in fee simple to include not only the improvements but also the plot of ground on which they are to rest, thereby necessitating subdivision of the 47-acre tract. In addition, whereas condominium owners hold an undivided interest in the common elements of a project, under the amended Quail Brook regime the common elements would be owned by an incorporated nonprofit homeowners' association. As was to be the case under the original plan, the homeowners' association would have the responsibility of managing the common elements. Further, in both cases membership in the homeowners' association and the right to enjoy the common elements would arise only in conjunction with the ownership of the residential units.
Quail Brook sought the amendment described above in order "to utilize new concepts and ideas" and "to meet present market conditions ... and be fully competitive in the housing market." *561 On June 10, 1981, after considering the evidence with respect to the proposed amendment, the planning board concluded that the reasons advanced in its support were outweighed by the "detrimental effect of the proposed change upon the Township," including possible taxation and aesthetic difficulties. The board therefore resolved to deny the requested amendment. This decision was affirmed by the Franklin Township Council on October 22, 1981 by a vote of 5 to 3, with one abstention. Two of the majority votes were cast by persons who were members of the planning board when it decided to reject the proposed amendment.
On November 18, 1981 Bonner Properties filed this complaint in lieu of prerogative writs. Bonner alleges that the decisions of the planning board and township council were unreasonable, arbitrary and capricious in that the requested amendment seeks "relief associated with the form of ownership of real property, [which] cannot be denied as a matter of law." Bonner also contends that the township council should have granted Bonner's motion to disqualify from the council proceedings in regard to the matter the two councilmen who had considered it while members of the planning board.
Thereafter, on January 29, 1982, this court approved a consent order permitting Bonner to amend its complaint to include Quail Brook as an additional plaintiff. Bonner and Quail Brook then moved for summary judgment. Defendants, in turn, filed answers, counterclaims and motions for summary judgment on the counterclaims. Plaintiffs responded by filing a cross-motion for summary judgment to dismiss the counterclaims. The issues raised and argued by the parties with respect to the merits of these motions will be considered after two preliminary questions are resolved: standing and ripeness for summary judgment.

II

A
Defendants argue that neither Bonner nor Quail Brook has standing to prosecute this action  Bonner in that it did not *562 apply for the resolution amendment and Quail Brook in that the conveyance of the subject property to it on March 16, 1979 by Bonner was void ab initio.
In arguing that Quail Brook lacks standing defendants rely on N.J.S.A. 40:55D-55, which states:
If, before final subdivision approval has been granted, any person transfers or sells or agrees to transfer or sell, except pursuant to an agreement expressly conditioned on final subdivision approval,... any land which forms a part of a subdivision for which municipal approval is required by ordinance pursuant to this act, such person shall be subject to a penalty not to exceed $1,000.00, and each lot disposition so made may be deemed a separate violation.
In addition to the foregoing, the municipality may institute and maintain a civil action
a. For injunctive relief; and
b. To set aside and invalidate any conveyance made pursuant to such a contract of sale....
... Any such action must be brought within 2 years after the date of the recording of the instrument of transfer, sale or conveyance of said land or within 6 years, if unrecorded.
This argument fails for the following reasons.
First, it is uncontradicted that the deed conveying title to the subject property from Bonner to Quail Brook was recorded on March 13, 1979 in the Office of the Somerset County Clerk. Therefore, an action seeking relief under the quoted statute could have been brought against plaintiffs only within two years after that date. Since the counterclaims relying on the statute were in fact brought in February 1982, they are barred. Nor can defendants avoid this result by invoking the "discovery rule." Under this rule a cause of action will not accrue in an appropriate case "until the injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action." O'Keeffe v. Snyder, 83 N.J. 478, 491 (1980). The discovery rule applies only "in relation to an accrual period of limitations" and not to a period of limitations "based upon a fixed objective event." Presslaff v. Robins, 168 N.J. Super. 543, 546 (App.Div. 1979). The rule would seem to be particularly inapplicable where the purpose of the objective event named in *563 a statute is to obviate claims of justifiable ignorance. Further, the planning board knew or should have known of the conveyance in that (i) the plans submitted to it in March 1979 state on their cover page: "Applicant and Owner, Quail Brook, Inc. (A Wholly Owned Subsidiary of Bonner Properties, Inc.);" (ii) a legal notice published by the township's director of planning at page 14 of the April 19, 1979 issue of the Somerset Spectator states: "... the Franklin Township Planning Board ... on April 11, 1979 ... GRANTED: Final approval with conditions to Site Plan # 286-1F, Quail Brook, Inc. (Bonner PUD) Phase I (A, B and C)."
Second, the conveyance of the subject property by Bonner to Quail Brook was not a transfer of "any land which forms part of a subdivision for which municipal approval is required." According to an affidavit sworn to by Hyman Cashvan, secretary of Bonner Properties, Inc., Bertram and Corella A. Bonner took title in 1954 to some 857 acres of property situated in Franklin Township. In 1955 the Bonners subdivided one of the tracts of which this property was comprised and conveyed 47.872 of its acres to Delt Corporation, a corporation wholly owned by the Bonners. The parcel conveyed to Delt is the same parcel that Bonner Properties conveyed to Quail Brook in 1979. The parcel has appeared as a separate lot on the Franklin Township tax map since 1956 and is zoned "R-40," unlike the remainder of the tract of which it was once a segment. Thus, the parcel in question is not "part of a subdivision" but a distinct lot, "to be used, developed or built upon as a unit." N.J.S.A. 40:55D-5. That it and neighboring parcels came under the single ownership of Bonner Properties does not integrate them all into a single entity, at least where "the owner has done nothing to destroy the distinct identity of the two lots as suitable building sites." Pribish v. Corbett, 105 N.J. Super. 407, 409 (App.Div. 1969). Supposing that the various tracts were placed under single ownership in order to facilitate approval of the proposed planned unit development; that fact in itself would not destroy their distinct identities. While such a development *564 is defined by statute as "an area with a specified minimum contiguous acreage ... to be developed as a single entity according to a plan," N.J.S.A. 40:55D-6, there is nothing to suggest that the functional unity of a planned unit development entails that the area upon which it is to be built must be regarded as a single lot.
It follows that the conveyance of the Phase I acreage by Bonner Properties to Quail Brook cannot be invalidated at this time. Quail Brook is therefore the owner of that acreage and thus has standing to prosecute this appeal. See N.J.S.A. 40:55D-4 ("Interested party"); Round Valley, Inc. v. Clinton Tp., 173 N.J. Super. 45, 51 (App.Div. 1980), certif. granted, 84 N.J. 414 (1980). Whether Bonner Properties, too, has standing need not be decided. See South Burlington Cty. NAACP v. Mt. Laurel Tp., 67 N.J. 151, 159, n. 3 (1975), app. dism. and cert. den. 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975).
It also follows from these considerations that defendants' counterclaims, which seek the relief set out in N.J.S.A. 40:55D-55, are without merit as a matter of law insofar as they concern the Phase I property. With respect to the remaining acreage subject to the June 23, 1976 resolution, the counterclaims allege only that Bonner Properties is negotiating to convey part or all of that property. Since liability under N.J.S.A. 40:55D-55 arises only when a person "transfers or sells or agrees to transfer or sell, except pursuant to an agreement expressly conditioned on final subdivision approval," the counterclaims are deficient in this regard, too, as a matter of law. Hence, plaintiffs' cross-motion for summary judgment dismissing the defendants' counterclaims must be granted.

B
Defendant planning board argues that plaintiffs' motion for summary judgment should be denied in that the case presents genuine issues of material fact. If so, the motion cannot be granted. See R. 4:46-2; Judson v. Peoples Bank & Trust Co. of *565 Westfield, 17 N.J. 67, 74 (1954). See, also, R. 4:69-2; Odabash v. Dumont, 65 N.J. 115, 121, n. 4 (1974), concerning the role of summary judgment in a complaint in lieu of prerogative writs. That this case is ripe for summary adjudication is best demonstrated by considering the substantive questions raised by the parties, who will henceforth be referred to as "Quail Brook" and "the township."

III
The primary argument advanced by Quail Brook relies on N.J.S.A. 40:55D-62 a and the line of cases beginning with Bridge Park Co. v. Highland Park, 113 N.J. Super. 219 (App.Div. 1971). The cited statute provides in pertinent part that "[t]he governing body [of a municipality] may adopt or amend a zoning ordinance relating to the nature and extent of the uses of land and of buildings and structures thereon." With respect to the prior version of this statute, N.J.S.A. 40:55-30, the Bridge Park case held that since the word "use" in it referred to "physical use," a municipality had no authority under the zoning power to regulate the form of ownership of property. 113 N.J. Super. at 222. According to Quail Brook, the township was therefore precluded as a matter of law from rejecting the proposed change of ownership of the Phase I land. This argument assumes that a resolution of the sort at issue here is within the intendment of the term "zoning ordinance" in N.J.S.A. 40:55D-62 a. Assuming that it is, the argument is nevertheless not persuasive in the present context.
First, Bridge Park and its progeny are distinguishable in that they concern forms of shared property ownership that the Legislature has protected from municipal discrimination in various respects. See as to the zoning power, N.J.S.A. 40:55D-58 (condominiums and cooperatives); N.J.S.A. 46:8B-29 (condominiums); Maplewood Village Ten. Ass'n v. Maplewood, 116 N.J. Super. 372 (Ch.Div. 1971) (condominium); as to tax exemptions and deductions, N.J.S.A. 46:8A-26 (horizontal property regimes); *566 N.J.S.A. 46:8B-19 (condominiums); Perth Amboy Gen'l Hosp. v. Perth Amboy, 176 N.J. Super. 307 (App.Div. 1980) (condominiums), and, as to conversion of rental housing into condominiums or cooperatives, N.J.S.A. 2A:18-61.1 to 61.12; Hampshire House Sponsor Corp. v. Fort Lee, 172 N.J. Super. 426 (Law Div. 1979). See, also, Plaza Joint Venture v. Atlantic City, 174 N.J. Super. 231 (App.Div. 1980); Claridge House One, Inc. v. Verona, 490 F. Supp. 706 (D.N.J. 1980), aff'd mem. 633 F.2d 209 (3 Cir.1980). However, because the Quail Brook proposal envisions a form of property ownership that cannot be regarded as a species of condominium, see N.J.S.A. 46:8B-3 h, 6, 7; cooperative, see N.J.S.A. 2A:18-61.7 c; AMR Realty Co. v. State, 149 N.J. Super. 329, 334 (App.Div. 1977), app. dism. 153 N.J. Super. 84 (1977); or horizontal property regime, see N.J.S.A. 46:8A-6, the aforementioned statutes do not apply to it.
In the view of Quail Brook the lacuna with respect to its "fee simple" concept exists only because this form of shared ownership was not employed in New Jersey in the 1960s when the horizontal property and condominium statutes were enacted, see, respectively, L. 1963, c. 168, codified as amended at N.J.S.A. 46:8A-1 to 28, and L. 1969, c. 257, codified as amended at N.J.S.A. 46:8B-1 to 38. But while the Legislature has frequently amended sections of these acts, most recently in 1980, see L. 1980, c. 103, amending N.J.S.A. 46:8B-31, 36 and 38, and during the 1970s enacted the zoning and rental conversion statutes cited above, it has not manifested the intent to accord to the "fee simple" concept the same protections that it has accorded to the other mentioned forms of shared ownership.
That the absence of such a manifestation of intent is not inadvertent may be inferred from the Planned Real Estate Development Full Disclosure Act, L. 1977, c. 419, codified at N.J.S.A. 45:22A-21 to 42. This act notes the "increased popularity" of "new," "various," and "proliferating" "forms of real estate development in which owners share common facilities." N.J.S.A. 45:22A-22. Cf. N.J.S.A. 45:22A-23 h (for purposes of the act such developments "shall specifically include, but shall *567 not be limited to, [condominiums], any form of homeowners' association, any housing cooperative or ... any ... trust device"). However, although the Legislature subjected these many forms of property ownership to certain disclosure requirements, it did not amend the aforementioned statutes to render them similarly all-encompassing, with the possible exception of N.J.S.A. 2A:18-61.1 to 61.12. See L. 1981, c. 8 (Mobile Home Parks  Conversion to Fee Ownership); L. 1981, c. 226 (Senior Citizens and Disabled Protected Tenancy Act); L. 1981, c. 445 (amending the Senior Citizens and Disabled Protected Tenancy Act). This combination of awareness and conduct suggests a legislative intent to limit each such statute to the form of property ownership it refers to. Cf. Mimkon v. Ford, 66 N.J. 426, 433 (1975); International Broth. of Elec. Workers v. Gillen, 174 N.J. Super. 326, 331 (App.Div. 1980). To the extent that cases such as Bridge Park rely on these statutes, they should be similarly restricted.
Second, as a consequence of the Mt. Laurel case, supra, the word "uses" in N.J.S.A. 40:55D-62 a cannot be construed to refer only to "physical" uses. Under the well-known holding of that case, a developing municipality "must permit multi-family housing" within its borders so that people of low and moderate income who desire to live there have a realistic possibility of doing so. 67 N.J. at 187. Since such people typically cannot afford to purchase residences, "multi-family housing" must be construed to refer to rental units, not developments in which owners share common facilities. While the promise of Mt. Laurel could be subverted by the impact of N.J.S.A. 2A:18-61.1 to 61.12, which permits landlords to convert rental housing into condominiums or cooperatives at will, see Hampshire House Sponsor Corp. v. Fort Lee, supra, it remains true that Mt. Laurel implicitly overruled the holding of Bridge Park that the zoning power, as a matter of law, cannot be employed to regulate ownership of land or the identity of its occupants. See Ventantonio, "`Equal Justice Under the Law': The Evolution of a National Commitment to Legal Services for the Poor and a *568 Study of Its Impact on New Jersey Landlord-Tenant Law," 7 Seton Hall L.Rev. 233, 296, n. 348 (1976). See, also, Rose, "Exclusionary Zoning and Managed Growth: Some Unresolved Issues," 6 Rutg.-Camd.L.Rev. 689, 697 (1975). What survives of Bridge Park is the principle that a municipality may not enact an ordinance that "merely affect[s] the location of title [to land]," Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., 80 N.J. 6, 36-37 (1976), app. dism. and cert. den. sub nom. Feldman v. Weymouth Tp., 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977)  that is, without furthering any legitimate municipal purpose. See, also, Oakwood at Madison, Inc. v. Madison Tp., 72 N.J. 481, 509, 516 (1977).
Third, a municipality need not rely on N.J.S.A. 40:55D-62 a to justify an action of the sort at issue here. Under the police power a municipality has the authority to "[m]anage, regulate and control [its] finances," N.J.S.A. 40:48-1, and to make such other enactments "as it may deem necessary and proper ... for the preservation of the ... welfare of the municipality ..., and as may be necessary to carry into effect the powers and duties conferred and imposed ... by any law," N.J.S.A. 40:48-2, provided that such enactments may not be contrary to state or federal law, id. In addition, a municipality may not act where the Legislature has preempted the field, Overlook Terr. Mgmt. Corp. v. West New York Rent Control Bd., 71 N.J. 451, 461 (1976), nor where the subject matter is inherently reserved for the State or requires uniform treatment, Sloan v. Lettieri, 171 N.J. Super. 445, 450 (Ch.Div. 1979), nor again beyond the powers granted to it by statute, Fred v. Old Tappan, 10 N.J. 515, 518 (1952). However, the New Jersey Constitution requires that statutes concerning municipalities be "liberally construed in their favor." N.J.Const. (1947), Art. IV, § VII, par. 11. N.J.S.A. 40:48-2 has thus consistently been regarded as in itself providing municipalities with a "broad reservoir" of police power. See, e.g., Dome Realty, Inc. v. Paterson, 83 N.J. 212, 230 (1980); Inganamort v. Fort Lee, 62 N.J. 521, 536 (1973); Fred v. Old Tappan, supra, 10 N.J. at 520-21.
*569 The rule of law to be culled from these considerations may be stated as follows: N.J.S.A. 40:55D-62 a does not invalidate a municipal action that inhibits a novel form of shared property ownership if the action is within the municipality's authority, if it furthers a legitimate municipal purpose and if it does not impinge upon an aspect of a novel form of shared property ownership that has been accorded special statutory protection. It is clear from the preceding discussion that the only way in which the resolution at issue here could fail this test is if it furthered no legitimate municipal purpose; the question of whether it does or not is thus the focus of the remainder of this opinion.

IV
According to the township, Quail Brook's desired shift of title to the Phase I land, partly to the individual unit owners, partly to an incorporated homeowners' association, creates potential difficulties for the township that would not exist under the condominium form of ownership. Only two of these concerns need be discussed: taxation and aesthetic integrity of the Phase I development.

A
The township claims that ownership of the common elements by a homeowners association could result in their being "lost to the tax rolls" in that the association's default would not threaten a unit owner with loss of his or her unit. Such an eventuality could not occur if Phase I remained a condominium. See N.J.S.A. 46:8B-3 o, 6, 19. Quail Brook argues that for three reasons this danger is also nonexistent under its amended plan: (1) the unit owners would not be willing to forego the very amenities that were an essential reason for purchasing a unit in the development; (2) the "Declaration of Covenants, Conditions and Restrictions" for the Phase I development imposes an assessment lien, including tax, on each unit and a personal obligation *570 for the same on each unit owner, both in favor of the homeowners' association, and (3) the common elements could be assessed at a nominal value and most of the tax burden shouldered by the individual units. These reasons are insufficient to overcome the township's concern.
First, unit owners might be willing to forego exclusive rights to the Phase I common elements under a variety of circumstances. A weak economy could provide sufficient incentive to withhold payment where the outcome of default would be nothing more than sharing facilities with the public, especially if few members of the public lived nearby. Or, the facilities could prove defective or otherwise unsatisfactory; inability to reach the developer, or refusal by him to make amends, could induce unit owners to refrain from meeting their obligations to the association. And it may be well to recall that often there are more things in heaven and earth than are dreamt of in our jurisprudence.
Second, while it may be assumed that the convenants included in the "Declaration" are valid, see Petersen v. Beekmere, Inc., 117 N.J. Super. 155 (Ch.Div. 1971); Neponsit Property Owners Ass'n v. Emigrant Industrial Sav. Bank, 278 N.Y. 248, 15 N.E.2d 793 (Ct.App. 1938); after 20 years the unit owners may amend or eliminate them by "vote of not less than eighty (80%) percent of the Lot Owners," Article X, Section 3 of the "Declaration," and perhaps unanimity could achieve the same result before that time, see Steve Vogli & Co. v. Lane, 405 S.W.2d 885, 888 (Mo.Sup.Ct. 1966). Moreover, the lien and personal obligation mentioned above run in favor of the homeowners' association, not the township. Since the unit owners comprise the membership of the homeowners' association, they could direct it not to enforce either and thus insulate their units from the association's default. Quail Brook has cited no authority that would permit the township to reach the units under these circumstances. Cf. N.J.S.A. 54:5-6 ("Taxes on lands shall be a lien on the land on which they are assessed"); Brewer v. Porch, 53 N.J. 167, 173 (1969) ("municipal liens, and the rights arising therefrom, *571 are solely statutory in origin and are fixed and determined by the statute") (citation omitted). See, also, Newark v. Central & Lafayette Realty Co., Inc., 150 N.J. Super. 18 (App.Div. 1977).
Third, under N.J.S.A. 54:4-23 each parcel of real property must be assessed at "the full and fair value ... it would sell for at a fair and bona fide sale by private contract." What is to be assessed is the true value of the property itself, not the value of the owner's title to it. Stack v. Hoboken, 45 N.J. Super. 294, 300 (App.Div. 1957); Wayne Mall, Inc. v. Wayne Tp., 2 N.J. Tax 1, 24 (Tax Ct. 1980). See, also, Koester v. Hunterdon Cty. Bd. of Tax., 79 N.J. 381, 392 (1979). The tax assessor has no discretion to apply a different standard. Gehin-Scott v. Willingboro Tp., 176 N.J. Super. 642, 648 1 N.J. Tax 546, 551 (Tax Ct. 1980). Thus, property cannot be assessed at a nominal value unless it actually has only a nominal value.
The case of Englewood Cliffs v. Allison's Estate, 69 N.J. Super. 514 (App.Div. 1961), cited by Quail Brook, is not to the contrary but merely distinguishable. At issue in Englewood Cliffs was the valuation of a park dedicated to public use under a charitable trust. Because of the public's right to enjoy the park, the likelihood of its being sold was "so slight as to be almost nonexistent." Id. at 524. While noting that this fact did not exempt the park from local real estate taxation, id. at 518 the court held that it should be assessed in the same manner as property burdened by an easement for the benefit of adjoining property, id. at 526 and cases cited there  that is, exclusive of "elements of value transferred to other properties or ... to the community at large in the form of public rights." Id. at 529. The Englewood Cliffs holding is inapposite here for the same reasons that it was found inapposite in the case of In re Neptune Tp. Appeal, 86 N.J. Super. 492 (App.Div. 1965): the property in question has not been dedicated to public purposes, nor is it burdened by easements to the public or to another taxpayer "within the meaning of the cases which permit a reduction in value because of such easement." Id. at 500 *572 (citations omitted). As observed in Grasser v. Graham, 97 Misc.2d 417, 420, 411 N.Y.S.2d 836, 839 (Sup.Ct. 1978), "Courts are likely to find a subservient parcel has substantial value where, as here, the owners of the easements are automatically members of a corporation owning the property sought to be taxed." See, also, Tower West Apartment Ass'n v. West New York, 2 N.J. Tax 565 (Tax Ct. 1981). Thus, the rule of Englewood Cliffs fails to obviate the township's tax concerns.
These concerns outweigh Quail Brook's sole and unsupported argument that the Phase I units would be more competitive in the housing market if its proposal were approved. While it is true that they are now merely speculative, it is also true that by permitting them to become actual the township could lose its chance to deal with them effectively. Cf. Levin v. Livingston Tp., 35 N.J. 500, 511 (1961). Moreover, requiring approval of the Quail Brook proposal would, in essence, preclude later denials of similar proposals. As a result, the township could face difficulties far greater in magnitude than any that the Phase I development alone might cause. The township therefore had a legitimate municipal purpose in rejecting Quail Brook's severance of ownership proposal. For the same reasons, the township's denial of that proposal was not arbitrary, capricious, and unreasonable.

B
The township claims that individual ownership of the unit plots, including a front and back yard, would threaten the aesthetic integrity of the Phase I development. Quail Brook argues that Article V of its "Declaration" affords sufficient protection in this regard. Article V states that after the development has been completed
... no building, fence, wall or other structure shall be commenced, erected or maintained upon the Properties, nor shall any exterior addition or change or alteration therein be made [without the approval] in writing as to harmony of external design and location in relation to surrounding structures and topography by the Board of Directors of the Association [or its representatives].
*573 The Article runs with and binds the land for 20 years and "may be amended by vote of not less than eighty (80%) percent of the Lot Owners." Art. X, § 3 of the "Declaration."
This restriction is valid. See Petersen v. Beekmere, Inc., supra, and cases cited there. See, also, Roehrs v. Lees, 178 N.J. Super. 399 (App.Div. 1981). Further, it is as likely to be effective in maintaining harmony of external design as any mechanism available to a condominium association, especially where every unit in the development has some ground level frontage. A condominium association is no more likely to pluck stray flowers than the Quail Brook board of directors, while eyesores could be readily extirpated by either body. Moreover, the greater variety in appearance that might emerge under the Quail Brook proposal could very likely not be prohibited by the township in that the Condominium Act expressly permits "yards, gardens, [and] walkways [to be] specifically reserved or limited to a particular unit." N.J.S.A. 46:8B-3 d(iii).
Hence, the aesthetic concerns voiced by the township further no legitimate municipal purpose. Since they form the sole basis for the township's refusal to permit individual ownership of the unit plots, that refusal was erroneous and must be reversed. See, also, the resolution quoted on p. 559, supra.

V
The preceding considerations thus lead to a mixed result: ownership of the Phase I common elements will not be severed from ownership of the Phase I units but the individual unit owners will own their unit plots. That this hybrid form of property ownership should be permitted to compete in the market place may readily be inferred from the statutes cited on pages 566-67 above, especially N.J.S.A. 45:22A-22. Whether it should be regarded as a species of condominium or not is more difficult to determine.
Under the New Jersey Condominium Act, "condominium" is defined as "the form of ownership of real property ... providing *574 for ownership by one or more owners of units of improvements together with an undivided interest in common elements appurtenant to each such unit." N.J.S.A. 46:8B-3 h. This definition could be read to suggest that only "units of improvements" are to be owned individually and not the land under them. The suggestion is in accord with most American condominium legislation, which generally envisioned high-rise buildings divided into separate units, see Schreiber, "The Lateral Housing Development: Condominium or Home Owners Association?", 117 U.Pa.L.Rev. 1104, 1109-12 (1969), and which generally denied unit owners permission to own unit plots, see Berger and Rohan, "Condominium v. Home Owners Association Arrangements: An Overview," 48 St. John's L.Rev. 736, 741 (1974). The New Jersey statute arguably falls into this category. Cf. N.J.S.A. 40:55D-12 b (setting forth certain notice requirements in regard to a "condominium association, in the case of any unit owner whose unit has a unit above or below it").
On the other hand, some jurisdictions permit unit owners in a condominium to own their unit plots. See, e.g., Ga.Code § 85-1603e(d), (g), (i) and (z); N.Y. Real Property Law § 339-e 13. The New Jersey statute could also fall into this category. As noted above, it specifically permits reservation of yards, gardens and walkways to particular units. N.J.S.A. 46:8B-3 d(iii). Moreover, the statutory definition of the term "unit" does not preclude ownership of such amenities as part of the ownership of a unit. N.J.S.A. 46:8B-3o. Nor is there any reason to imply such a restriction in the statute. The ownership of small unit plots by the unit owners does not alter the character of a condominium project. "[T]he central idea of the `condominium' is not separate ownership of layers of vertical space. It is rather the combination of separate ownership of space with shared ownership of various `common elements' in a project." United Masonry, Inc. v. Jefferson Mews, Inc., 218 Va. 360, 363, 237 S.E.2d 171, 173 (Sup.Ct.App. 1977) (quoting Bergin, "Virginia's Horizontal Property Act: An Introductory Analysis," *575 52 Va.L.Rev. 961, 961, n. 1 (1966)) (emphasis in case). See also, Schreiber, supra, p. 22 at 1157. Further, to hold that developments, including unit ownership of unit plots, are not within the purview of the Condominium Act could spawn uncertainty as to the legal status of various aspects of the development, here, for example, in regard to its termination as a shared ownership project. See N.J.S.A. 46:8B-26, 27. The minority view is thus the better one. In the absence of a manifest legislative intent to impose the majority restriction, the better view should be, and is, adopted here. See International Broth. of Elec. Workers v. Gillen, 174 N.J. Super. at 331.
Two final points deserve only fleeting consideration. First, N.J.S.A. 40:55D-23 specifically provides that the membership of a municipal planning board shall include a member of the municipality's governing body, except where it consists of only three members, and the mayor or manager of the municipality. To require disqualification of these two parties on any appeal taken from a decision of the planning board would subvert the clear legislative intention that they serve a dual role as provided by the statute. Second, defendants filed no cross-motion for summary judgment on the complaint. However, since there are no issues of material fact to be decided in this case, and since plaintiffs as a matter of law have no right to sever ownership in the manner they desire, judgment should be granted for the defendants in this regard. See R. 4:42-6.
Therefore, for all of the above reasons, plaintiffs' cross-motion for summary judgment on the counterclaims is granted, and plaintiffs' motion for summary judgment is granted insofar as it seeks relief with respect to unit ownership of the Phase I unit plots, and denied insofar as it seeks severance of ownership of the Phase I common elements from ownership of the Phase I units, with judgment to be entered for the defendants in this regard.